## AFFIDAVIT IN SUPPORT OF A COMPLAINT

I, Thomas M. Griffin, Jr., being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the United States Secret Service (USSS) and have been so employed since January of 1997.  Prior to my employment with the Secret Service, I was employed with the Richland County Sheriff's Department, Columbia, SC.  I have over 25 years of law enforcement experience with an extensive investigative background. I received a Bachelor degree in Criminal Justice from the University of South Carolina.  I have received training at the Federal Law Enforcement Training Center, United States Secret Service Rowley Training Center and the South Carolina Criminal Justice Academy.  I've received training in the techniques and methodology of general law enforcement and white collar criminal investigations.  I am currently assigned to the Greenville Resident Office, Greenville, SC as the Resident Agent in Charge.

2.      This investigation is being conducted jointly by the USSS and Greenville County Sheriff's Office.  The information contained in this affidavit is based, in part, on my personal knowledge and observations during the course of this investigation and information provided to me by cooperating sources and other law enforcement agents/officers.  Additionally, this affidavit is based on my training and experience as well as that of other law enforcement agents/officers assisting in this investigation.  This affidavit is intended only to establish probable cause.

## Statutory Authority

3.      This investigation concerns violations of 18 U.S. C. § 1341, which prohibits schemes and artifices to defraud using the mails.  Under the statute:

Whoever, having devised or intending to devise any scheme or

1

artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

## Summary of the Offense

4.    Ronnie Gene Wilson (hereinafter Wilson) operates Atlantic Bullion and Coin, Inc. (hereinafter AB&C) in Easley, South Carolina.  One of the investments offered by AB&C is a Silver Investment Account wherein the client does not take physical possession of their investment, but rather AB&C allegedly holds the client's silver at a Delaware Depository. Records reveal that Wilson is not actually purchasing a sufficient amount of silver to cover the orders placed by his clients.  Moreover, Wilson is altering client account statements to reflect different prices and numbers of shares from that found in the original order and/or original account statement.

5.    Wilson has solicited investors to use the United States mails to send funds for purported legitimate investment opportunities with the Silver Investment Accounts. In addition, Wilson has encouraged investors to use interstate wire signals when they request to sell all or part of the alleged holdings.

6.    All indications are that the Silver Investment Accounts are nothing more than tools used in an elaborate Ponzi scheme.  A Ponzi scheme is a fraudulent investment program in which funds are paid in by investors and later investors funds are used to pay out nonexistent phantom profits to the original investors, thus creating the illusion that the fraudulent investment

2

program is a successful, profit generating enterprise which, in turn, attracts new investment funds that are used to sustain the fraudulent program.

## Wilson and AB&C

7.     Wilson is 64 years old and resides in Easley, South Carolina.  He is the president and sole shareholder of AB&C.  Wilson, or someone acting on his behalf, filed papers to incorporate AB&C in South Carolina on April 23, 1985.  Wilson is specifically identified as the Registered Agent of AB&C.

8.     AB&C is currently located at 203 Siloam Road and 205 Siloam Road, Easley, SC 29642.

## The Scheme and Artifice to Defraud

9.     Your affiant has reviewed subpoenaed bank records for AB&C and the personal bank accounts of Wilson; investment records seized on March 15, 2012, from the offices of AB&C; and other documents related to the business activities of AB&C provided by investors and others.  In addition, your affiant has interviewed investors, employees of AB&C, business associates of Wilson, and others.  The documents and interviews reveal the following.

10.     AB&C and/or Wilson, on one or more occasions, created and provided account statements which contained false or fraudulent information concerning the price and number of shares allegedly purchased and/or sold for an investor and the investor's return on investment ("ROI").

a.     AB&C account statement as of February 25, 2011 (the "February 25, 2011 statement") (Exhibit 1) shows the following silver purchases at the following prices on the dates listed for customer number 10466:

| Date | Ounces Purchased | Price per Ounce | Purchase Amount |
|---|---|---|---|
| 11/17/2010 | 800 | $24.00 | $19,200.00 |
| 12/2/2010 | 900 | $25.00 | $22,500.00 |
| 12/2/2010 | 600 | $25.00 | $15,000.00 |

b.    The February 25, 2011 statement indicates that the silver purchased above (totaling 2,300 ounces) was sold on January 19, 2011, for $29.81 per ounce, resulting in proceeds of $68,563.00.

c.    The February 25, 2011 statement also reflects a new purchase of 2,600 ounces of silver on January 28, 2011, at a price of $26.47 per ounce, resulting in a cost of $68,822.00.

d.    On or around March 23, 2011, customer number 10466 indicated his intent to liquidate his investments with AB&C.

e.    On or around March 28, 2011, the shares allegedly purchased for customer number 10466 on January 28, 2011, were allegedly sold.

f.    Following the sale, AB&C provided to customer number 10466 an account statement allegedly as of April 7, 2011 (the "April 7, 2011 statement") (Exhibit 2). The April 7, 2011 statement shows an increase in the price per ounce charged to the client for his first three silver purchases of $2.70 per ounce, $5.24 per ounce, and $5.24 per ounce, respectively.

g.    The April 7, 2011 statement further indicated fewer ounces of silver were purchased for customer number 10466 in 2010, leaving the client with fewer ounces to

4

reinvest when AB&C allegedly traded his account in and out between January 19 and January 28, 2011, and with even fewer ounces to liquidate when the investor requested that his account be liquidated.

h.     AB&C account statement as of March 1, 2011 (the "March 1, 2011 statement") (Exhibit 3) shows a purchase of 4900 ounces of silver at $25.00 per ounce was made on December 20, 2010, for customer number 10520.

i.     The same account statement indicates the 4,900 ounce investment was sold on January 19, 2011, for $29.81 per ounce, resulting in proceeds of $146,069.00.

j.     The March 1, 2011 statement also reflects a new purchase of 5,500 ounces of silver on January 28, 2011, at a price of $26.47 per ounce, resulting in a cost of $145,585.00.

k.     On or around March 23, 2011, customer number 10520 indicated his intent to liquidate his investments.

l.     On or around March 28, 2011, the shares allegedly purchased for customer number 10520 on January 28, 2011, were allegedly sold.

m.     Following the sale, Wilson provided to customer number 10520 an account statement allegedly as of April 7, 2011 (the "April 7, 2011 statement (second account)") (Exhibit 4). The April 7, 2011 statement (second account) shows the price per ounce charged the client for his initial silver purchase of 4,900 ounces as $30.71, an increase of $5.71 per ounce over what the March 1, 2011 statement showed.

n.     The April 7, 2011 statement (second account) further indicated fewer

ounces of silver were purchased for customer number 10520 in 2010, leaving the client with fewer ounces to reinvest when Wilson allegedly traded his account in and out between January 19 and January 28, 2011, and even with fewer ounces to liquidate when the investor requested that his account be liquidated.

o.      AB&C account statement as of March 9, 2011 (Exhibit 5) shows a purchase of 2,600 ounces of silver at $34.00 per ounce was made on March 9, 2011, for customer number 11150.

p.      On or around March 23, 2011, customer number 11150 indicated his intent to liquidate his investments with Wilson.

q.      On or around March 28, 2011, the shares allegedly purchased on March 9, 2011, were allegedly sold.

r.      Following the sale, AB&C provided to customer number 11150 an account statement allegedly as of April 11, 2011 (the "April 11, 2011 statement") (Exhibit 6). The April 11, 2011 statement showed the price per ounce charged the client for his initial silver purchase as $37.67, an increase of $3.67 per ounce over what the March 9, 2011 statement showed.

s.      The April 11, 2011 statement further indicated fewer ounces of silver were purchased for the client than shown on the March 9, 2011 statement, leaving the client with fewer ounces to liquidate when the investor requested that his account be liquidated.

t.      The treatment of investor accounts as described above show that, in an effort to keep the Ponzi scheme going, Wilson manipulated account statements so that when he

6

was called upon to make payouts by investors, he reduced the outflow of cash from the coffers of AB&C.

11.    Your affiant is aware that on or around February 1, 2012, Wilson gave a statement under oath that:

a.    His and AB&C's silver business was "buying bars" in 100 or 1,000 ounce quantities exclusively;

b.    He and AB&C actually took possession of the silver bars; and

c.    He and AB&C did not store anything; they would ship silver purchased to the client or the client could pick it up, but that "everything goes out to the client."

12.    Based on facts known to me through sources described in paragraph 9 of this affidavit, no evidence exists which tends to support Wilson's statements that he and AB&C actually took possession of any significant quantity of silver bars or that silver purchased for clients (excluding approximately four Sterling Trust clients) was shipped to the clients or held for pickup. Records I have reviewed show the monies received from investors being used for Wilson's and his family's personal business interests. The documents do not reveal transactions where Wilson or AB&C were purchasing precious metals in any amount commensurate with the investor dollars received.

13.    It is known to the affiant that during the period on or about January 1, 2011, to on or about February 29, 2012, approximately thirty-three million dollars ($33,000,000.00), was given to Wilson for "silver" and/or "silver investments" from clients covering 25 different states.

7

14.    During the period on or about January 1, 2009, to on or about February 29, 2012, approximately sixty-five million dollars ($65,000,000.00) was placed with Wilson, the majority of which was for investments in silver.

15.    On or around March 1, 2012, Wilson represented to the SC Attorney General's Office Staff that his silver purchases occurred through "FideliTrade" and that client silver was stored at "the Delaware Depository."

16.    During the period January 1, 2009, to February 28, 2012, Wilson purchased a total of approximately eighty-five (85) 1000 ounce silver bullion bars through FideliTrade.

17.    Following their purchase, the silver bars were allotted as follows: sixty-four (64) were purchased for the IRA accounts of four (4) Sterling Trust clients and were transferred out by FideliTrade to Sterling Trust, and the remaining twenty-one (21) were sold by AB&C on or around June 8, 2011 (9 bars) and on or around December 23, 2011 (12 bars).

18.    Wilson and AB&C received approximately six hundred ninety-three thousand, one hundred fourteen dollars and thirteen cents ($693,114.13) from the sale of the twenty-one (21) bars.

19.    None of the limited amount of silver purchased by Wilson was purchased for client account 10466, 10520, or 11150.

20.    Your affiant knows that the corporate records of the firm that Wilson alleges holds silver for AB&C and/or its clients, Delaware Depository Service Company, LLC ("the Delaware Depository"), were checked.

21.    Your affiant knows through the investigation that no account, contract, or stored

8

silver was located for AB&C and/or Wilson, at the Delaware Depository.

22.    On March 12, 2012, this affiant interviewed Stephanie Whitman Robins ("Robins"), Administrative Assistant at AB&C, regarding the Silver Investment Accounts and other matters. Robins stated that she had never seen any of the physical silver for the Silver Investment accounts and had never seen any paperwork or mail from a Delaware Depository (or any other silver holding company) in terms of the current amount of silver purchased or stored on behalf of AB&C or their clients. Robins stated that there were approximately 800 – 900 currently active clients in the Silver Investment Accounts.

23.    On March 13, 2012, this affiant interviewed Jena Gail Eison ("Eison"), former Vice President of AB&C, and current Director of Marketing and Advertising for Live Oaks Farm. Eison stated that she began working at AB&C around January 2007 as an Administrative Assistant, but her title was later changed to Administrative Executive. Eison stated that she eventually received the title Vice President of AB&C, but Wilson still handled all aspects of the buying and selling of the silver for the Silver Investment accounts while she handled all other aspects of the company. Eison stated that she had never seen any of the physical silver for the Silver Investment accounts and had never seen any paperwork or mail from Delaware Depository (or any other silver holding company) in terms of the current amount of silver purchased or stored on behalf of AB&C or their clients. Eison stated that she had previously asked Wilson about the location of the silver and inquired if she could go see the silver. Eison stated she also asked Wilson how he facilitates the buying and selling of silver, and what is the holding arrangement at the depository. Eison stated that she had asked Wilson to reassure her and a few clients that had inquired about the existence of the silver. Eison stated that Wilson responded

9

that the silver was stored in Delaware, someplace where she would not be allowed to enter, and that he handles the purchase and sale of the Silver Investments over the phone with the depository. Eison also stated that Wilson had indicated to her that he received purchase/sales receipts and holding statements from the depository via fax. Eison stated that, when she inquired about seeing these documents, Wilson would merely dismiss her concerns.

24.     On March 26, 2012, Secret Service agents interviewed Joey Preston. Preston was an investor with Wilson and recruited individuals to invest with AB&C. Preston stated that during the prior week he had a conversation with Wilson wherein Wilson stated that the Silver Investment Accounts were operated as a Ponzi scheme and that there were insufficient silver holdings to repay investors.

## Use of the Mails

25.     On or about October 29, 2009, customer number 91277 mailed checks from Louisville, KY, to AB&C in Easley, SC.

26.     On or about January 30, 2012, customer number 12232 located in Acton, MA, received via the U.S. mail an AB&C account statement that was mailed from Easley, SC.

## Conclusion

27.     Based on the above information, your affiant submits that there is probable cause to believe that 18 U.S.C. § 1341 has been violated. This investigation reveals that Wilson and/or AB&C, encourages clients to invest in Silver Investment Accounts wherein the client does not take physical possession of the precious metals, but rather AB&C would allegedly hold the client's silver at a Delaware Depository. Records reveal that Wilson is not actually purchasing a sufficient amount of silver to cover the orders placed by his clients. Moreover, Wilson is altering

client account statements to reflect different prices and numbers of shares from that found in the original order and/or original account statement.

Therefore, this Affiant respectfully requests that an ARREST WARRANT be issued authorizing the United States Secret Service, with appropriate assistance from other law enforcement officers, to arrest Ronnie Gene Wilson.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

Thomas M. Griffin
United States Secret Service
Resident Agent in Charge
Greenville Resident Office

Sworn to and subscribed before me this
____ day of April 2012.

11